UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES POLAND ) | CASE NO. CV 10-02878 MMM (PLAx) |
| ) | |
| Plaintiff, ) | ORDER GRANTING DEFENDANT'S |
| ) | MOTION FOR SUMMARY JUDGMENT |
| vs. ) | |
| ) | |
| UNITED STATES ATTORNEY ) | |
| GENERAL ) | |
| ) | |
| Defendant. ) | |

James Poland filed this action on July 15, 2009, in the United States District Court for the District of Oregon.[1] On September 28, 2009, he filed a first amended complaint in that district.[2] The amended complaint alleges that plaintiff is a former employee of the United States Customs Service ("USCS"), which is now part of the Department of Homeland Security.[3] Plaintiff contends that while employed by USCS, he filed an age discrimination and retaliation complaint against USCS, and later sued USCS in district court in Oregon.[4] He asserts that, in June 2007, the Federal Bureau of Investigations ("FBI") retaliated against him for filing a

---

[1]Complaint, Docket No. 1 (July 15, 2009).

[2]First Amended Complaint, Docket No. 7 (Sept. 28, 2009).

[3]*Id.*, ¶ 3.

[4]*Id.*, ¶ 4.

discrimination/retaliation complaint against and suing USCS by refusing to award his limited liability company, J.R. Poland & Associates, LLC, a contract.[5]  Plaintiff seeks damages equal to the amount he would have received had his company been awarded the contract, as well as attorneys' fees and costs.[6]

On October 16, 2009, defendant filed a motion to dismiss, or alternatively, to transfer venue to the Central District of California.[7]  Judge Anna J. Brown granted defendant's motion to transfer venue on March 19, 2010, and declined to decide the merits of defendant's motion to dismiss.[8]  The court received notice of the transfer on March 19, 2010.[9]  Once the case was in this district, defendant filed an *ex parte* application for leave to file a renewed motion to dismiss,[10] which the court granted.[11]  Defendant's Rule 12(b)(6) motion argued that plaintiff failed to state a claim under the ADEA because plaintiff applied for employment as an independent contractor, rather than an employee.[12]  Alternatively, it argued that plaintiff failed to state a claim because the ADEA applies to individuals, and plaintiff's limited liability company – rather than plaintiff in his

---

[5]*Id.*, ¶¶ 5-7.

[6]*Id.*, ¶¶ 8-9.

[7]Motion to Dismiss or, in the Alternative to Transfer Plaintiff's First Amended Complaint, Docket No. 8 (Oct. 16, 2009).

[8]Opinion and Order ("J. Brown Order"), Docket No. 27 (Mar. 19, 2010), at 11 n. 2 ("Because the Court concludes venue is not proper, the Court does not address that part of Defendant's Motion to Dismiss in which Defendant asserts Plaintiff failed to state a claim").

[9]Notice of Receipt of Case Transfer, Docket No. 31 (Mar. 19, 2010).

[10]Ex Parte Application for Leave to File Renewed Motion to Dismiss, Docket No. 47 (Aug. 13, 2010).

[11]Order Re Defendant's Ex Parte Application, Docket No. 48 (Aug. 16, 2010).

[12]Motion to Dismiss Case, Docket No. 50 (Aug. 24, 2010) at 6-8.

individual capacity – applied for the position in question.[13]  Plaintiff opposed the motion.[14]

After reviewing the motion papers, the court entered an order advising the parties of its intent to convert defendant's motion to dismiss into a motion for summary judgment given the fact-intensive nature of the inquiry necessary to assess whether plaintiff applied for a position as an employee or as an independent contractor.[15]  The court offered both parties the opportunity to submit additional briefs and evidence for its consideration.[16]  Defendant thereafter filed a motion for summary judgment.[17]  Plaintiff opposed this motion as well.[18]

## I.  FACTUAL BACKGROUND

In January 2002, plaintiff incorporated J.R. Poland & Associates, LLC ("J.R. Poland").[19] In approximately May 2006, the FBI established the Regulatory Inspections 2257 Program ("2257

---

[13]*Id*. at 5-6.

[14]Opposition to Motion, Docket No. 51 (Sept. 30, 2010).

[15]Minute Order Notification of Intent to Construe Defendant's Motion to Dismiss as a Motion for Summary Judgment, Docket No. 53 (Nov. 5, 2010) at 2.

[16]*Id*. at 3.

[17]Motion for Summary Judgment ("Motion"), Docket No. 55 (Nov. 29, 2010).  In addition to the arguments asserted in defendant's motion to dismiss, defendant's motion argues that plaintiff cannot to make out a *prima facie* case of age discrimination under the ADEA and that the FBI had a legitimate, non-discriminatory reason for not offering the contract to him.  (*Id*. at 18-21.)  On December 22, 2010, the court entered an order noting that defendant's motion exceeded the scope of the motion authorized by the court's November 5, 2010 order, and stating that it would consider and decide the motion only as to claims asserted in defendant's motion to dismiss.  (In Chambers Order Re Defendant's Motion for Summary Judgment, Docket No. 59 (Dec. 22, 2010), 3.)  Consequently, this order does not address defendant's new bases for the entry of summary judgment, which will need to be the subject of discovery before they can properly be considered by the court.

[18]Opposition to Motion for Summary Judgment ("Opposition"), Docket No. 60 (Jan. 9, 2011).

[19]Declaration of Sekret T. Sneed ("Sneed Decl."), ¶¶ 2, 5; Ex. A (Deposition of James R. Poland ("Poland Depo.") at 30:12-23; Ex. D (certificate of incorporation)).

Program") to ensure that producers of sexually explicit materials were complying with applicable laws and regulations.[20] Inspectors review sexually explicit materials – most commonly, films or videos – created by producers in the adult entertainment industry, and conduct on-site inspections, or audits, of the producers' files and records.[21] When it initiated the 2257 Program, the FBI contracted with four "independent contractors" – three men and one woman – to act as inspectors.[22] Each of the inspectors was a former FBI agent.[23] FBI Supervisory Special Agent Charles R. Joyner, together with another Supervisory Special Agent, oversaw the program. No current "FBI employees" acted as inspectors, however.[24]

The FBI trained the inspectors who were going to review the sexually explicit material. After they were trained, however, the inspectors conducted their review independently.[25] Inspectors work in a secure room in a federal building in Van Nuys, California; they are not located in an FBI building.[26] The FBI had initially considered having the independent contractors review the materials at their homes; given their sensitive nature, however, it obtained a secure location devoted to the review.[27]

Joyner is in charge of the day-to-day operation of the 2257 Program.[28] He typically works at the FBI's Los Angeles office in the morning, and travels in the late morning or early afternoon to the Van Nuys federal building to ascertain if any of the inspectors have questions or need

---

[20]Declaration of Charles R. Joyner ("Joyner Decl."), ¶ 2.

[21]*Id.*

[22]*Id.*, ¶ 3.

[23]*Id.*

[24]*Id.*

[25]*Id.*, ¶ 4.

[26]*Id.*

[27]*Id.*

[28]*Id.*, ¶ 5.

4

input.[29]  Joyner has a separate office near the inspectors' work room.[30]  Occasionally, the inspectors ask Joyner a legal or policy question; they work independently, however, reviewing material, reporting, and documenting their review.[31]

The FBI does not require that the inspectors start work at any given time, or leave at any particular time.[32]  The inspectors do not have set work schedules beyond those they set for themselves.  They can access the work room at any time.[33]  Inspectors are responsible for their own state and federal tax contributions, do not accrue annual leave or vacation hours, do not accrue sick leave, and do not receive retirement credits.[34]

Once the inspectors complete review of a particular producer's materials, they write a report regarding the materials.[35]  The inspectors compile these reports "without any input from anyone at the FBI," and submit them to Joyner.[36]  Joyner reviews the reports and, once all reports are completed for a selected producer, schedules an on-site inspection.[37]  The inspectors and Joyner travel to the producer's premises so that the inspectors can conduct an onsite inspection.[38]

---

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*, ¶ 6.

[33]*Id.*

[34]Poland Depo. at 35:13-22, 26:7-17; Declaration of Kevin Kearney ("Kearney Decl."), Docket No. 61 (Jan. 9, 2011), Exh. 2 ("Contracting Officer for the Regulatory Inspections 2257 Program Contract – Request for Proposal 322806") at 7.

[35]Joyner Decl., ¶ 7.

[36]*Id.*

[37]*Id.*

[38]*Id.*

The inspectors work independently at the site to complete the inspection;[39] Joyner does not direct the course or manner of the inspection while there. He merely accompanies the inspectors to provide appropriate legal authority for their activities.[40]

The inspectors write reports detailing the results of the onsite inspection, which they submit to Joyner prior to departing the business premises.[41] These reports are completed "without any input from anyone at the FBI."[42] Based on the reports, Joyner compiles a list of violations, if any, and give it the producer.[43] Joyner later uses the inspectors' reports to write a summary inspection report that he forwards to FBI Headquarters and the Department of Justice.[44]

Although plaintiff contends that FBI agents control the inspectors' daily work performance, and their conduct of the onsite inspections, he acknowledged at his deposition that he has no personal knowledge regarding the extent to which the FBI supervises the inspectors' work.[45]

In approximately 2007, the FBI received funding to add additional inspectors to the 2257

---

[39]*Id.*

[40]*Id.*

[41]*Id.*, ¶ 8.

[42]*Id.*

[43]*Id.*

[44]*Id.*

[45]Poland Depo. at 44:18-25 (Q: So you don't know the level of supervision that was there either, correct? A: I just remember what it stated in the proposal, that – who your immediate supervisor was. Q: But you don't know the level of supervision that immediate supervisor would have had over you, correct? A: That's correct"); *id.* at 46:15-47:9 (Q: And you also mentioned – when we were discussing why you believe you were applying to be an employee – total control over work product. Could you explain what you mean by that? A: Well, every aspect of the job: what documents you would review, how you would conduct your reviews, how you'd tabulate the information, if there was any analysis, all of that, it's my understanding, went with that particular type of job. Q: But you have no personal knowledge that the FBI supervisors had total control over the work product, correct? A: Well, my recollection of reading the solicitation was they did. Q: So your belief is based on a solicitation notice? A: That's true and – Q: The request for proposal? A: Yes").

Program.[46]  On March 13, 2007, FBI Contracting Officer Deborah Chin posted a "Presolicitation Notice," which sought inspectors for the 2257 Program, on a website – the Federal Business Opportunities website, or FedBizOpps, located at www.fbo.gov.  This website can be accessed by the public and is devoted exclusively to identifying available opportunities to contract with the federal government.[47]  Defendant contends there were no employment opportunities posted on this website, but only independent contractor positions.[48]  Plaintiff submitted a proposal for the inspector position listed on the website.[49]  His proposal identified the contracting party as J.R. Poland & Associates, LLC.[50]

The solicitation includes the following pertinent terms:

"Description of Services: The Contractor shall provide the Federal Bureau of Investigation (FBI) with Inspection services to assist the FBI's Crimes Against Children Unit in conducting inspections of producers of depictions of sexually explicit activity (Producer).  This task involves the review of materials containing sexually explicit activity for compliance with the laws and regulations as specified in Title 18 United States Code Section 2257. . . ."[51]

Type of Contract: This requirement shall be awarded to eight (8) contractors as [a] firm fixed price labor hours indefinite delivery indefinite quantity type (IDIQ) contract.  The estimated minimum is 80 labor hours with a maximum of 2,000 labor hours.  The performance period for all services shall consist of a 12 month base

---

[46]*Id.*, ¶ 9.

[47]Declaration of Deborah F. Chin ("Chin Decl."), Exh. A (July 18, 2007 Regulatory Inspections 2257 Program FedBizOpps post).

[48]Defendant's Statement of Uncontroverted Facts ("SUF"), ¶ 19.

[49]*Id.*

[50]Sneed Decl., ¶ 3; Exh. B (plaintiff's U.S. Department of Justice Complaint for Discrimination) (stating "Name Agency Where You Work: Contractor").

[51]Kearney Decl., Exh. 2 at 1.

with four 1-year options [for extension].[52]

Pricing Information: The Government will compensate the contractor for direct labor hours at the specified fixed hourly rate as prescribed in Section B.3, inclusive of wages, indirect costs, (overhead, general and administrative expenses) and profit. The estimated 2,080 hours per person represents performance of services for forty (40) hours per week for fifty-two weeks per year, excluding U.S. Federal government holidays.[53]

Overtime: Should the Government require service beyond eight (8) hours per day or forty (40) hours per week, the Contractor will be reimbursed at the fixed hourly rates established in Paragraphs B.3.1 through B.3.5 of the contract. No separate overtime rate or overtime premium is applicable. Request for overtime and access to the site outside of normal working hours (6:00am-6:00pm) shall be made in writing to the Contracting Officer's Technical Representative (COTR) not less than three (3) calendar days in advance of need or (1) day for emergency requests.[54]

Ceiling Price (Labor Type Contract): . . . The Government reserves the right to renew any resultant contract for four (4) one-year option periods, depending on the availability of funds and the continuing need of the Government and the contractor's achieving a satisfactory performance rating on the mid-year and annual performance reviews."[55]

Statement of Work: This individual will work with a team that will conduct inspections of producers of depictions of sexually explicit activity (Producer) as outlined below. . . . Contractors will normally work out of an FBI facility located

---

[52]*Id.*

[53]*Id.* at 1-2.

[54]*Id.* at 3.

[55]*Id.* at 4.

in the James C. Corman Federal Building, 6230 Van Nuys Boulevard, Los Angeles,
California, with parking provided by the FBI in an attached, underground, secure
facility. Proper attire for work at this facility would be described as 'business
casual.' At this location, Contractors will review materials which contain
depictions of sexually explicit activity in order to determine whether there has been
compliance with law and regulations as outlined below. Contractors must be able
to follow printed instructions and complete checklists during these product reviews.
Additionally Contractors will conduct internet searches for information concerning
producers of these sexually explicit depictions. Once an in-house review of a
producer's material is completed, Contractors will travel with [FBI employees] to
conduct an on-site record-keeping inspection at the Producer's place of business.
During these on-site inspections, Contractors will be expected to be observant of
possible violations (other than those for which the inspection is planned) which may
be in plain sight. Contractors will be expected to present themselves professionally
during these on-site inspections, and wear proper business attire. . . . Contractors
will wear an ID card on their clothing which will identify them as Contractors.
Contractors should expect·to work from 8:00 am to 5:00 pm Monday through
Friday with weekends, holidays and vacation days off. Contractors will not be paid
for sick leave and vacation hours."[56]

The solicitation required the contractors to submit monthly invoices for payment.[57] Finally, it
included several indemnification provisions, requiring the contractor to indemnify the government
for damage to property.[58]

---

[56]*Id.* at 5.

[57]*Id.* at 8.

[58]*Id.*

## II. DISCUSSION

### A.   Legal Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c).   A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.   On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or otherwise as provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986);   FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence.   Rather, it draws all inferences in the light most favorable to the nonmoving party.   See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).   The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.   See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### B.   Whether Plaintiff Applied for a Position as an Employee or an Independent Contractor

Defendant contends that plaintiff cannot assert an age discrimination claim under the Age

10

Discrimination Employment Act ("ADEA")[59] because he did not apply for a position as an agency "employee;" rather, defendant asserts, plaintiff applied for a position as an independent contractor.[60] "Determining whether a relationship is one of employment or independent contractual affiliation requires a fact-specific inquiry which depends on the economic realities of the situation." *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999) (quoting *Mitchell v. Frank R. Howard Memorial Hosp.*, 853 F.2d 762, 766 (9th Cir.1988), and *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980) (internal quotations omitted)), cert.

---

[59]"The Age Discrimination in Employment Act ('ADEA') 29 U.S.C. § 621 *et seq*. prohibits employers and labor organizations from discriminating against older workers with regard to the scope, terms, and conditions of employment. "The ADEA became law due to rising numbers of long-term unemployment among older workers, resulting from arbitrary age limitations set by employers." *Luce v. Dalton*, 166 F.R.D. 457, 459 (S.D. Cal. 1996) (citing 29 U.S.C. §§ 621, 623). The ADEA "makes it 'unlawful for an employer. . .to fail or refuse to hire or to discharge any individual [who is at least 40 years of age] . . . because of such individual's age.'" *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280 (9th Cir. 2000) (citing 29 U.S.C. §§ 623(a), 631(a)). "To establish a prima facie case of age discrimination through circumstantial evidence, the plaintiff must show that he was: (1) a member of a protected class [age 40-70]; (2) performing his job in a satisfactory manner; (3) discharged; and (4) replaced by a substantially younger employee with equal or inferior qualifications." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994)).

"The ADEA not only protects against discrimination, but also specifically protects against retaliation as well." *Cozzi v. County of Marin*, No. C 08-3633 PJH, 2010 WL 1532359, *11 (N.D. Cal. Apr. 16, 2010) (citing 29 U.S.C. § 626(d)). "To make a prima facie case of retaliation under . . . the ADEA, plaintiff must establish (1) that he engaged in a protected activity; (2) that he suffered an adverse employment decision; and (3) that a causal link exists between the protected activity and the employment decision." *Whitsitt v. Barbosa*, No. CIV S-06-0397 MCE JFM PS, 2007 WL 1725487, *3 (E.D. Cal. June 14, 2007) (citing *Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); and *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996)); *Orum v. Chertoff*, No. C05-00795 MJJ, 2007 WL 4593497, *4 (N.D. Cal. Dec. 28, 2007) ("[T]o establish a prima facie case of retaliation, a plaintiff must offer proof: (1) that the plaintiff was involved in a protected activity opposing an unlawful employment practice, (2) that the plaintiff suffered an adverse employment action, and (3) that there was a causal link between the protected activity and the adverse action," citing *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006)).

[60]Motion at 15.

denied, 528 U.S. 816 (1999).[61] The primary factor that distinguishes the relationships is "the extent of the employer's right to control the means and manner of the worker's performance." *Adcock*, 166 F.3d at 1292; *Lutcher*, 633 F.2d at 883. "Other factors include: whether the 'employer' or the individual in question furnishes the equipment used and the place of work; the length of time during which the individual has worked; the method of payment; and whether the work is an integral part of the business of the 'employer.'" *Mitchell*, 853 F.2d at 766; see also *Adcock*, 166 F.3d at 1292 (also identifying "the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or by a specialist without supervision[,] . . . whether the employer pays social security taxes[,] the manner in which the work relationship is terminated[,] and the intention of the parties"); *Lutcher*, 633 F.2d 833 n. 5 (also identifying the skill required in the occupation, the method of payment (i.e., whether by time or by the job), the manner in which the work relationship is terminated (i.e., by one or both parties, with or without notice and explanation), whether annual leave is afforded, and whether the work accumulates retirement benefits, citing *Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C. Cir. 1979)). "Generally. . .the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends upon particular combinations." *Sahinovic v. Consolidated*

---

[61]The Ninth Circuit recently clarified that "there is no functional difference between the . . . formulation[ ]" of the employee-independent contractor test set forth in *Adcock*, and the common law agency approach adopted by the Supreme Court in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992). See *Murray v. Principal Financial Group, Inc.*, 613 F.3d 943, 945 (9th Cir. 2010) ("We take this opportunity to clarify what the district court ultimately recognized: there is no functional difference between the . . . formulations. 'The common law agency approach [of *Darden*] is essentially indistinguishable from the approach previously used by this Circuit. . . ,'" citing *Adcock*, 166 F.3d at 1292 n. 3 (alterations original)). The *Darden* Court identified the following factors as relevant: "[1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; [8] the hired party's role in hiring and paying assistants; [9] whether the work is part of the regular business of the hiring party; [10] whether the hiring party is in business; [11] the provision of employee benefits; and [12] the tax treatment of the hired party." *Murray*, 613 F.3d at 845-46 (citing *Darden*, 503 U.S. at 323).

*Delivery & Logistics, Inc.*, No. C 02-4966 SBA, 2004 WL 5833528, *9 (N.D. Cal. Sept. 13, 2004) (citing *Holloman v. Northeast Georgia Area Development Com'n*, 740 F.Supp. 1571, 1578 (M.D. Ga. 1990) (internal quotation omitted)).

Whether a plaintiff is an employee or an independent contractor is generally a question of law, and is susceptible of resolution on summary judgment when the material facts are undisputed. See *Hale v. State of Ariz.*, 967 F.2d 1356, 1360 (9th Cir. 1992) (" Whether an employer-employee relationship existed under [the ADEA] is a question of law");[62] *Burt v. Broyhill Furniture Industries, Inc.*, No. CV 04-2929-PHX-MHM, 2006 WL 2711495, *7 (D. Ariz. Sept. 18, 2006) ("The determination of whether a plaintiff is an employee or an independent contractor is a question of law, while the existence and degree of the legal factors to be considered in this determination are questions of fact").

Plaintiff advances the following arguments to show that he applied for a position as an FBI employee: "defendant required 'contractors' to work at a specific facility between specif[ed] hours; defendant required 'contractors' to park in certain areas and to dress in a professional manner; defendant controlled in minute detail how work was done; defendant required 'contractors' to travel with [FBI employees] to conduct inspections; defendant directed and controlled 'contractors' during on-site inspections. . . ; work had to be completed in eight-hour days[;] defendant paid by the hour and restricted overtime; defendant controlled contract renewal and made this dependent on satisfactory work performance; [and] defendant evaluated work performance."[63]

### 1. Intention of the Parties

It is undisputed that the FBI's solicitation specifically identified the 2257 inspector position

---

[62]Although *Hale* addressed this question in the context of interpreting the Fair Labor Standards Act, rather than the ADEA, "'cases construing the definitional provisions of [Title VII] are persuasive authorities when interpreting [the FLSA or the ADEA]' because the definition of 'employee' in the three Acts is virtually identical." *Hale*, 967 F.2d at 1363 (quoting *Hyland v. New Haven Radiology Assocs.*, 794 F.2d 793, 796 (2nd Cir. 1986)).

[63]Statement of Genuine Disputes ("SGI"), Docket No. 62 (Jan. 9, 2011), 2-3.

as a "contractor" position.[64] It is likewise undisputed that, in his proposal, plaintiff identified J.R. Poland as a "contractor."[65] Although not dispositive, "clear language" indicating that the individual performing services will be an independent contractor "reflects the parties' intention[s]" regarding the type of relationship to be formed, and supports a finding that the individual is not an employee. *Adcock*, 166 F.3d at 1293; *Ruiz v. Affinity Logistics Corp.*, 697 F.Supp.2d 1199, 1220 (S.D. Cal. 2010) (concluding that ""whether or not the parties believe they are creating an agency relationship" weighed in favor of a finding that plaintiffs were independent contractors because "[t]he record clearly indicates that Ruiz and Affinity both understood their relationship to be that of an independent contractor" (applying Georgia law)); see *Rush v. Watkins Motor Lines, Inc.*, 58 Fed. Appx. 320, 322 (9th Cir. Mar. 3, 2003) (Unpub. Disp.) ("Additional factors also support the district court's ruling. . . . [T]he standard contract between Watkins and a contractor states that 'neither of the parties hereto is the employer, employee, partner, joint venturer or agent of the other. . . ,'" citing *Barnhart v. N.Y. Life Ins. Co.*, 141 F.3d 1310, 1313 (9th Cir. 1998) (citing language in a contract as evidence of the parties' intention to enter into independent contractor relationship)). See also *Harris v. Vector Marketing Corp.*, 656 F.Supp.2d 1128, 1140 (N.D. Cal. 2009) (weighing "[w]hether the parties believe they are creating an employer-employee relationship," but also stating that contractual language indicating that sales representatives "conduct . . . business on an independent contractor basis . . . did not preclude [the] worker from being an employee"). This factor therefore weighs in favor of a finding that plaintiff applied for an independent contractor position.

## 2. Means and Manner of Performance

As noted, the primary factor that distinguishes an employment relationship from an independent contractor position is "the extent of the employer's right to control the means and manner of the worker's performance." *Adcock*, 166 F.3d at 1292; *Lutcher*, 633 F.2d at 883. "Typically, the more supervision involved, the more likely it is that the relationship between the

---

[64]See, e.g., Kearney Decl., Exh. 2 at 1.

[65]Sneed Decl., ¶ 3, Exh. B.

14

parties is one of employee-employer because the employer is exercising control." *Sahinovic v. Consolidated Delivery & Logistics, Inc.*, No. C 02-4966 SBA, 2004 WL 5833528, *5 (N.D. Cal. Sept. 13, 2004). Compare *Plute v. Roadway Package System, Inc.*, 141 F.Supp.2d 1005, 1011 (N.D. Cal. 2001) ("There is evidence, however, to suggest that Plute did not possess the sort of broad control over his job that is indicative of an independent contractor relationship. According to Plute, FedEx controlled his delivery routes . . . and imposed supervision") with *Adcock*, 166 F.3d at 1292-93 (holding that a franchised auto dealer was an independent contractor rather than an employee of Chrysler where she had the contractual right to determine the means and manner in which cars were sold so long as she used her "best efforts to promote energetically and sell aggressively and effectively," maintained discretion over employment decisions, determined the means and manner of advertising, and set the hours of operation, limited only by a contractual provision that required her to remain open "at least during the hours usual in the trade").

Significant to this inquiry is the level of discretionary control the employer exercises over plaintiff's work on a daily basis. "As the Seventh Circuit has reasoned 'one can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract. This sort of one-time 'control' is significantly different than the discretionary control an employer daily exercises over its employees' conduct." *Sahinovic*, 2004 WL 5833528 at *7 (citing *Equal Employment Opportunity Comm. v. North Knox School Corp.*, 154 F.3d 744, 748 (7th Cir. 1998) (holding that a school district that contracted with bus drivers who provided their own vehicles was not an employer simply because it set the drivers' precise routes and schedules )); see also *North Knox School Corp.*, 154 F.3d at 748 ("As other examples of North Knox's 'control' and 'supervision,' the EEOC cites to the detailed specifications in the transportation contracts, which set 'the precise route and schedule of each driver.' And the EEOC contends that North Knox 'controls' the drivers because it 'limits the number of times and permissible reasons a regular driver may be absent, requiring him to obtain a substitute driver from a list approved by the Board. Also North Knox requires the drivers to enforce its disciplinary policies but 'restricts the disciplinary tools available to bus drivers and retains the ultimate authority to sanction pupil misconduct. . . .' Certainly one can 'control' the conduct of

another contracting party by setting out in detail his obligations; [however,] [t]he precise specifications [of a contract] do not make the contractor an employee of the government").

Here, the solicitation stated that "[c]ontractors [would] normally work out of an FBI facility located in the James C. Corman Federal Building . . . with parking provided by the FBI in an attached, underground, secure facility." It indicated that the contractors would be required to wear "business casual" attire, and "review . . . sexually explicit [materials]" to evaluate whether they complied with applicable laws and regulations. The solicitation suggested that contractors would be given written instructions and be required to complete checklists as part of their work, and that they would need to conduct internet searches regarding the producers of the sexually explicit material. The solicitation also stated that after completing a review of the materials, the contractors would be required to travel to the producer's business location with FBI employees to inspect the producer's onsite recordkeeping. It outlined the contractors' duties while conducting the onsite investigation, which included noting violations "in plain sight." The solicitation advised that during onsite inspections, the contractors would be expected to wear "proper business attire," display "an ID card," and conduct themselves professionally. Finally, it stated that contractors "should expect·to work from 8:00 am to 5:00 pm Monday through Friday with weekends, holidays and vacation days off."[66] The proposal noted that the FBI could extend the contract upon "a satisfactory performance rating on the mid-year and annual performance reviews."[67]

The solicitation, which in effect constituted an offer to contract, details many of the inspectors' job functions and responsibilities in the same manner as the contract in *North Knox School Corp.*, 154 F.3d at 748. There, as noted, the court concluded that the specific terms of the contract did not make the bus drivers employees. The undisputed evidence in this case shows, moreover, that the FBI exercised little discretionary control over the inspectors' actual work. Inspectors were trained to review sexually explicit materials, follow printed instructions, complete

---

[66]Kearney Decl., Exh. 2 at 5.

[67]*Id.* at 4.

16

checklists, and conduct internet searches regarding the producers of the material.[68]   They also participated in onsite inspections of producers' facilities, looking for possible violations.[69] Although the inspectors were required to conduct their work at the  James C. Corman Federal Building; this location was selected due to  "sensitive nature of the materials" involved because it was "secure."[70]

The FBI provided initial training and required the inspectors to follow written instructions and checklists to ensure that they completed the tasks they were retained to perform.  It required that they display badges and wear business attire when visiting producers' business locations, and had Joyner accompany them, to ensure that they were identified as FBI-authorized personnel. Neither the training and instructions the inspectors received, nor the fact that they were required to dress a certain way or wear a badge when visiting producers' facilities, suggests the kind of control that supports the existence of an employer-employee relationship.  See *Hermann v. Mid-Atlantic Installation Svcs.*, 164 F.Supp.2d, 667, 672-74 (D. Md. 2000) (the fact that a cable installation company required a contractor to wear a uniform and badge when visiting a customer's house, to install cable systems in accord with strict specifications, and to work a prescribed route did not make the contractor an employee because "requiring a contractor to meet the client's technical specifications is not the type of 'control' which bestows 'employee' status on the contractor," wearing a uniform and badge "does not affect the Installers' economic dependence on or independence from [the cable installer] in any way, but merely allows consumers to be assured of their bona fides," and, while the installer's prescribing of routes was "close monitoring of progress and location [that] indicate[d] a certain degree of control over the Installers by MAT[,]

---

[68]Kearney Decl., Exh. 2 at 5.

[69]*Id.*

[70]Joyner Decl., ¶ 5.  Plaintiff contends the FBI mandated that inspectors park in a certain location.  (SGI at 2-3.)  He provides no support for this proposition, and the record contains evidence to the contrary.  While the FBI *provided* parking "in an attached, underground, secure facility," there is no indication that inspectors were required to park in that facility.  (Joyner Decl., ¶ 8.)

[i]t [was] insufficient in and of itself . . . to transform the relationship . . . into that of employer/employee"); see also *North Knox School Corp.*, 154 F.3d at 748 (holding that there was no employment relationship between a school district and bus drivers despite the fact that the school district prescribed the drivers' route and schedule and imposed other requirements); *Sahinovic*, 2004 WL 5833528 at *7 ("[T]he supervision that CD & L provided was the supervision necessary to perform the transportation and delivery services for Kaiser. CD & L had to provide detailed instructions on dry ice because Plaintiffs were picking up and delivering blood and tissue. . . . CD & L had to establish a precise schedule [and] . . . require[ ] [the] wear[ing of] a uniform and ID badge to enable Kaiser employees to identify them as delivery drivers. Plaintiffs have submitted no evidence of CD & L imposing supervision beyond the scope required for the performance of the delivery services. None of the supervision Plaintiffs ha[s] identified was discretionary").

Rather, such requirements appear to reflect the FBI's detailing of the inspectors' contractual obligations in the solicitation – i.e., the type of "one-time 'control'" that is an acceptable form of contracting, *North Knox School Corp.*, 154 F.3d at 748 – and the imposition of conditions (e.g., displaying a badge while onsite at producers' facilities) that allowed the inspectors to perform the services they had contracted to deliver. As for the discretionary aspects of the inspectors' jobs, there is no evidence that the FBI dictated the manner in which the inspectors wrote their reports or in which they conducted their onsite investigations. Compare *Penland v. Connecticut Mut. Life Ins. Co.*, , No. C-92-3744 MHP, 1993 WL 204257, *2, 4-5 (N.D. Cal. June 9, 1993) ("("Although Connecticut Mutual did not directly supervise Mr. Penland on a daily basis, they exercised control over the manner of his work, monitored his performance in some detail, and expected him to implement company suggestions. . . . For instance, Connecticut Mutual's officers would routinely visit Mr. Penland's agency to assure compliance with company directives. . . . [It] was decided that Mr. Penland would re-establish weekly management meetings, produce monthly instead of quarterly bulletins, establish agency meetings on a regular basis, and continue special events, such as the golf tournament and the annual trip to Lake Tahoe"); see *Sahinovic*, 2004 WL 5833528 at *7 ("The difference between the outcomes

in *Penland* and *Hermann* stems from the difference in the activity being supervised. In *Penland*, the activity the employer was supervising was discretionary activity, such as when to produce bulletins, when to establish meetings and what special events to hold. In *Hermann*, the activities were required to fulfill the [installation] service[;] if the cable installer failed to wear a uniform and ID badge, customers might not let him into their home to install cable. If the cable installer failed to follow protocol, the installation itself might fail, or otherwise cause damage to the cable customer's property").

Examining Joyner's discretionary control over the means and manner of inspectors' performance of their work, Joyner asserts that the FBI provided initial training for the inspectors, but that thereafter they worked independently to review the producers' materials.[71] He works at the FBI's Los Angeles office in the morning, and travels in the late morning or early afternoon to the Van Nuys federal building where the inspectors perform the review function.[72] Once there, he works in a separate office.[73] While he is available for questions, inspectors work independently to review, report on, and document the pertinent material.[74] There is no evidence that Joyner oversees their performance, regularly checks on them, regularly reviews what they are doing, or necessarily interacts with them on any given day. Nor is there evidence that Joyner has the power to accept, reject, or alter the work product the inspectors produce. Rather, the evidence reflects that inspectors write reports detailing their review of the producers' materials and the results of their onsite inspections, which they submit to Joyner.[75] The reports are completed "without any input from anyone at the FBI."[76] Based on the reports, Joyner compiles a list of violations, if any,

---

[71]Joyner Decl., ¶ 4.

[72]Joyner Decl., ¶ 5.

[73]*Id.*

[74]*Id.*

[75]*Id.*, ¶ 8.

[76]*Id.*

and provides it to the producer.[77]  He later uses the inspectors' reports to write a summary inspection report that he forwards to FBI Headquarters and the Department of Justice.[78]

This evidence belies plaintiff's assertion – which, as noted, is not based on personal knowledge – that "defendant controlled in minute detail how work was done."[79]  It is customary, "[i]n the typical client-contractor relationship, [that] the client will 'review' the work performed by the contractor to determine whether it meets [its] expectations."  *Sibbald v. Johnson*, 294 F.Supp.2d 1173, 1178 (S.D. Cal. 2003).  As the *Sibbald* court noted, "while suggestive of control, . . . [the] statement that [a federal employee] 'supervised' [plaintiff's] work is . . . ambiguous," because "[p]resumably, any large government contract will be supervised to some extent by the relevant government agency."  *Id.*

At oral argument, Poland asserted that the terms of the solicitation were inconsistent with Joyner's testimony, and that a jury would have to weigh the evidence to determine which description of the position was the more accurate.  This contention is unpersuasive.  As an initial matter, the most that the solicitation establishes is that the FBI had certain general expectations and requirements for the position.  It does not speak in any way to an inspector's day-to-day activities.  The legal standard, by contrast, focuses on the economic realities of the parties' relationship, not general parameters for the position set forth in an offer to contract.  See *Adcock*, 166 F.3d at 1293 (noting that, "even though the Agreement requires the dealer to conduct its operations 'at least during the hours usual in the trade' of the dealer's sales locality, the actual hours of the dealership are left to the dealer's discretion," and concluding that this weighed in favor of independent contractor status).  Consequently, the solicitation cannot be used to controvert Joyner's testimony in the manner plaintiff suggests.

More fundamentally, particularly given the general terms in which it is framed, the solicitation is not facially inconsistent with Joyner's testimony.  It sets forth a general description

---

[77]*Id.*

[78]*Id.*

[79]SGI, ¶ 2.

of the contractors' work, informing applicants that they "must be able to follow printed instructions and complete checklists during these product reviews," as well as attend on-site inspections and comport themselves in a professional manner while doing so.[80]  While the solicitation suggests, and Joyner testified, that the inspectors were responsible for drafting reports and submitting them to Joyner for review, some level of review is required even in an independent contractor relationship to ensure that the client's expectations are being met.  The solicitation does not contradict Joyner's assertion that inspectors worked independently, and that there were no specific requirements as to the hours they were required to work.  Similarly, it does not contradict his statement that he did not closely supervise or monitor inspectors during the on-site inspections.  The solicitation therefore fails to raise triable issues of fact or create a conflict with Joyner's testimony.[81]

Given the fact that there is minimal evidence of daily oversight and discretionary control over the inspectors' work, this factor weighs in favor of a finding that plaintiff applied for a position as an independent contractor.  See *Sibbald*, 294 F.Supp.2d at 1178 ("While the evidentiary record provides some evidence to support Plaintiff's claim that the Navy supervised some of her work and provided guidance on the performance of the tasks, Plaintiff's declaration establishes that she was almost exclusively engaged in performing the activities and job

---

[80]Kearney Decl., Exh. 2 at 7.

[81]Plaintiff's counsel acknowledged at oral argument that he had had an opportunity to depose Joyner, but had been unable to elicit any contradictory testimony from him.  Nor is there any other evidence in the record that controverts Joyner's statements.  Poland is thus reduced to relying on speculation regarding "credibility issues" with Joyner's testimony, which in the absence of concrete, admissible evidence suggesting that the testimony is not to be believed, is insufficient to create triable issues of fact.  See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.");  *Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 802 (9th Cir. 2009) ("[A]n inference is reasonable 'when it may be drawn from the evidence without resort to speculation,'" quoting *Genthe v. Lincoln*, 383 F.3d 713, 716 (8th Cir. 2004));  *Program Engineering, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1194 (9th Cir. 1980) ("'A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation'").

responsibilities identified in the Task Order. This evidence is insufficient to create a genuine issue of material fact"); *Brug v. National Coalition of the Homeless*, 45 F.Supp.2d 33, 38 (D.D.C. 1999) (holding that plaintiff's declaration that HUD "directed, critiqued, defined and approved every major aspect of [her] work" was insufficient as a matter of law to raise a genuine issue of material fact because the declaration "did not list specific facts in support of her sweeping claim that [HUD] directed and controlled every aspect of her work"); *Sorahan v. United States*, No. 97 C 3463, 1997 WL 573403, *3 (N.D. Ill. Sept. 11, 1997) ("Sorahan contends this agreement contains provisions supporting a determination Peterson was a federal employee. . . . Specifically, Sorahan points to the provisions allowing the commanding officer to demand the same performance of Sterling practitioners as it does Navy practitioners, the right to perform background checks and drug testing, and requiring Sterling to abide by governmental regulations, rules and bylaws. None of these provisions indicate the requisite exercise of strict control over the day-to-day activities of Peterson. . . . The authority of the government to review the performance of and determine the qualifications of [physicians] . . . does not support Robb's position that these physicians were employees of the government. This provision amounts to nothing more than a standard quality assurance clause by which the government reserves the right to determine whether it is satisfied with the services it is purchasing under the contract"). Cf. *Redd v. Summers*, 232 F.3d 933, 938 (D.C. Cir. 2000) ("Banks's brief . . . intervention into Redd's routine does not qualify as 'control[ling] the 'means and manner'' of her performance").

### 3.     The Extent of the Hired Party's Discretion Over When and How Long to Work

The FBI exercised some control over the inspectors' hours. The solicitation noted that they were generally expected to work from 8:00 a.m. to 5:00 p.m. Monday through Friday, and required that they submit "requests for overtime and access to the site outside of normal working hours (6:00am-6:00pm)."[82] Where overtime payment was not required, however, inspectors were

---

[82]Kearney Decl., Exh. 2 at 4.

"free to set their own work schedule,"[83] to start work at any given time, and to leave at any given

time.[84] The fact that the FBI set general work hour parameters and sought to control overtime

work is not alone sufficient to support a finding that plaintiff would have been an FBI employee

had he become an inspector, particularly given undisputed evidence that, within regular business

hours, the inspectors set their own schedule and worked as many or as few hours as they wished.

See *Estate of Suskovich v. Anthem Health Plans Of Virginia, Inc.*, 553 F.3d 559, 566 (7th Cir.

2009) ("Merely setting a work schedule is not sufficient to support a finding that a given person

is an employee rather than an independent contractor"); *Ost v. West Suburban Travelers*

*Limousine, Inc.*, 88 F.3d 435, 438-39 (7th Cir. 1996) ("Ms. Ost submits that, on working days,

the [limousine] driver's starting time essentially was determined by West Suburban because the

early morning assignments were set by West Suburban. At the end of the day, the drivers were

required to call into West Suburban's dispatching service and to inform West Suburban that they

were leaving the road for the day. West Suburban, in addition, required that Ms. Ost's vehicle

be made available for service during certain times. . . . These constraints do not, however,

establish an employer-employee relationship because the details concerning performance of the

work remained essentially within the control of the driver"). See also *Alberty-Velez v.*

*Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 9 (1st Cir. 2004) (concluding

that a television station was not an actress's employer despite the fact that it "dictated the location

of her work by selecting the filming sites, and determined the hours of her work by requiring her

to be on-call during filming days," because, "[w]hile 'control' over the manner, location, and

---

[83]Joyner Decl., ¶ 6.

[84]*Id*. The requirement that inspectors obtain approval before working overtime hours provides context for the statement in the solicitation that inspectors "should expect·to work from 8:00 am to 5:00 pm Monday through Friday." Viewed in light of Joyner's testimony that inspectors were free to set their own work schedule, with the exception that they had to obtain approval for overtime hours or after hours access, this provision reflects an effort to ensure that the FBI not be held responsible for overtime payments and not be required to open its premises at odd hours absent prior approval. It does not reflect an attempt to impose standardized work hours.

hours of work is often critical to the independent contractor/employee analysis, it must be considered in light of the work performed and the industry at issue"); *Cilecek v. Inova Health System Services*, 115 F.3d 256, 262 (4th Cir. 1997) (concluding that a physician who worked in a hospital emergency room was an independent contractor despite the fact that the entity responsible for staffing the hospital determined the total number of hours he would work because the physician was able to propose the number of hours he was willing to work, and the staffing entity's determination of actual hours was necessary to ensure "coordination with the needs of the hospital in staffing the emergency room").

Here, given the FBI's determination that it was necessary to restrict the location at which the inspectors performed their review due to the sensitive nature of the materials involved, the requirement that inspectors obtain approval for overtime and after-hours access was necessary to ensure smooth operation of the facility and did not impair the inspectors' ability to set the number and general time of the hours they worked. Stated differently, any control exercised by the FBI in this regard must be "considered in light of the work performed and the industry at issue." *Alberty-Velez*, 361 F.3d at 9. This factor therefore weighs in favor of a finding of independent contractor status.

### 4.    Location of the Work

The requirement at which the contractors were to perform their review work – i.e., a federal building in Van Nuys – is the type of fact that is often deemed significant in assessing whether an employee relationship has been formed. See, e.g., *Loomis Cabinet Co. v. Occupational Safety & Health Review Comm'n*, 20 F.3d 938, 942 (9th Cir. 1994) (the "most significant[ ]" factor in support of finding employment relationship was that employer owned work site and provided all of the equipment, while the employees provided labor only); *Mitchell*, 853 F.2d at 766 (the fact that a radiologist performed services at a hospital, partially using equipment provided by the hospital, supported a finding that the radiologist was a hospital employee, not independent contractor). See also *Darden*, 503 U.S. at 323. Compare *Murray*, 613 F.3d at 945 (citing as one of "several factors [that] strongly favor[ed] classifying Murray as an independent contractor" the fact that she "decide[d] when and where to work, and in fact maintain[ed] her own

office, where she pa[id] rent"). Cf. *Clairmont v. Sound Mental Health*, _632 F.3d 1091, 2011 WL 149371, *4-5 (9th Cir. 2011) (concluding, in a First Amendment retaliation case, that plaintiff, who was employed as a domestic violence counselor by a private treatment provider that had contracted with the municipal court to provide services , should be treated as a public employee, *inter alia*, because the treatment provider for which he worked "offered its services at the courthouse" and was contractually obligated to furnish "'staff coverage in the court Resource Center 40 hours per week'").

Nonetheless, the importance to be ascribed to this factor in the present case is offset by the fact that the contractors did not work out of an established FBI office and were directed to work in a federally owned building due to the sensitive nature of the materials they were reviewing. See *Redd*, 232 F.3d at 940 ("Of course the Bureau provided office space and the tour guides worked at the Bureau, but in context this proves little. That a landscaper's employees worked at the site of a landscaping job would hardly support an inference that they were the client's employees; the nature of the work compels the site").

In analogous situations, courts have determined that the government's contractual specification that work be carried out at a particular location is not reflective of an employment relationship. See *Sibbald*, 294 F.Supp.2d at 1178 n. 2 ("The court . . . rejects Plaintiff's contention that the requisite employment relationship is established because she worked at the NCTS site and used materials and equipment provided by the Navy," citing *Lopez v. Johnson*, 333 F.3d 959, 963-64 (9th Cir. 2003) (the fact that plaintiff worked in Navy offices and used Navy supplies and equipment did not establish the Navy's control over the terms and conditions of plaintiff's employment)); see *Lopez*, 333 F.3d 959, 963-64 ("[a]lthough the Navy retained control over parking within PSNS and provided the office space and equipment Lopez used, it did not retain any control over the terms and conditions of his work. . . . Other than providing the situs of the work Lopez performed, PSNS had no control over his job performance"). Thus, even if it be assumed that this factor weighs in favor of a finding of employee status, it does so only slightly.

### 5. Duration of Relationship

Turning to the duration of the work relationship, the government initially contracts with the inspectors for a one year period; it reserves the right to renew the contract for four one-year option periods, however, so long as the contractor receives a satisfactory rating on mid-year and annual performance reviews.[85] Generally speaking, a "relatively permanent" relationship is "more characteristic of . . . employment . . . than of independent contractor status." *N.L.R.B. v. A.S. Abell Co.*, 327 F.2d 1, 8 (4th Cir. 1964).

Here, while the inspectors could have continued to work for as long as five years had their contracts been renewed, the optional nature of such an arrangement has been contrasted with the permanency of an employment relationship and held to be not inconsistent with independent contractor status. See *Peacock v. United States*, 597 F.3d 654, 660 (5th Cir. 2010) ("However, factor (f), the length of time for which the person is employed, supports classifying Dr. Wagner as an independent contractor. Dr. Warner's contract was for a short term (one year), renewable at the end of each term. Though Dr. Warner renewed his contract five times, renewing a short-term contract does not in and of itself create an employee relationship," citing *Linkous v. United States*, 142 F.3d 271, 277 (5th Cir. 1998) (ultimately concluding that a doctor was an independent contractor despite having worked for the government for "several years")). See also *North Knox School Corp.*, 154 F.3d at 750 ("The fifth factor, the 'length of job commitment and/or expectations,' also favors finding these drivers to be independent contractors. The length of the commitment was four years, which was set as a maximum term in the contracts"); *Creel v. United States*, 598 F.3d 210, 214 (5th Cir. 2010) ("[F]actor (f), the length of time for which the individual was employed, weighs in favor of independent contractor status. Mercer's contract was for a relatively short term (a maximum of one and a half years, including all options to extend its term). . ."); *In re FedEx Ground Package System, Inc.*, 734 F.Supp.2d 557, 595 (N.D. Ind. 2010) ("Options to renew or terminate a contract "[are not] atypical of an independent contractor relationship where a hiring party can simply decide not to re-hire a worker").

---

[85]*Id.* at 4.

In short, considering the relatively short duration of the inspectors' contracts, even accounting for optional renewal periods, this factor weighs in favor of a finding of independent contractor status.

### 6. Compensation

It is undisputed that plaintiff would not have received a salary for work he performed as an inspector; rather, he would have been compensated on an hourly basis after submitting "invoices" on a monthly basis.[86] This invoicing procedure is governed by federal regulations that set standards for all federal agency contractor payments. See 5 C.F.R. §§ 1315.1 et seq. Although paid at an hourly rate,[87] the fact that plaintiff would have had to submit invoices before receiving payment weighs in favor of a finding of independent contractor status. See *Janette v. American Fidelity Group, Ltd.*, 298 Fed. Appx. 467, 475 (6th Cir. Oct. 21, 2008) (Unpub. Disp.)

---

[86]Kearney Decl., Exh. 2 at 8.

[87]Some courts have found that the fact that a person is paid by the hour rather than by the job is evidence of a traditional employment relationship. See, e.g., *Associated General Contractors of California, Inc. v. N.L.R.B.*, 564 F.2d 271, 282 (9th Cir. 1977) (noting that being "paid on an hourly basis . . . is usually an indication of employee status"). Others have determined, by contrast, that tax forms and tax returns are the essential hallmarks of an employment versus independent contractor relationship. See *Estate of Suskovich v. Anthem Health Plans Of Virginia, Inc.*, 553 F.3d 559, 568 (7th Cir. 2009) ("The estate next argues that because Suskovich was paid by the hour, he was an employee rather than an independent contractor. It cites *Moberly* [*v. Day*, 757 N.E.2d 1007 (Ind. 2001)], and various commentary to the Restatement emphasizing that when a person is paid by the hour rather than by the job, such payment is evidence of a traditional employment relationship. Trasys and WellPoint, on the other hand, point out a number of cases from this court holding that tax forms and tax returns are essential when deciding which status this factor favors," citing *Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir. 2003); *Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 964-65 (7th Cir. 2001)). See also *North Knox School Corp.*, 154 F.3d at 749 ("The fourth factor, the 'method and form of payment and benefits,' also favors a finding that the drivers were independent contractors. . . . North Knox did not treat these drivers as employees for tax purposes or unemployment compensation benefits and did not issue the drivers a W-2, which would have been appropriate if their compensation had been salary or wages. Rather, North Knox issued them Form 1099s, which would be appropriate for independent contractors. And for tax purposes, Schuckman and Schultz treated themselves as sole proprietorships, listing their incomes on Schedule C, supported by the 1099s. Each one also paid self-employment tax on form SE for Social Security. Like the last factor, this one too strongly favors finding these drivers were independent contractors").

("if [plaintiff] did not submit an invoice, she did not receive remuneration. Such an arrangement differs markedly from a salaried employee who receives a certain dollar amount for any number of tasks regardless of the time spent or number completed. Therefore, as the district court concluded, this factor weighs in favor of independent contractor status"); *Prestenbach v. Global Intern. Marine, Inc.*, 244 Fed. Appx. 557, 560 (5th Cir. July 12, 2007) (Unpub. Disp.) ("While it is true that Prestenbach was paid fifteen dollars per hour for the job, he billed GIM for his work via invoice instead of waiting for a paycheck as a part-time employee would generally be expected to do"); *United States ex rel. Watson v. Connecticut General Life Ins. Co.*, 87 Fed. Appx. 257, 262 (3d Cir. Jan. 16, 2004) (Unpub. Disp.) ("Rather than providing an employee salary, CGLIC paid Watson according to the volume of services he performed, as reflected in a fee schedule based upon his periodic self-submitted invoices").

It is also undisputed that, had plaintiff obtained the 2257 inspector position, the FBI would not have paid social security taxes or provided retirement, health care, or vacation benefits for him. See *Adcock*, 166 F.3d at 1293 (identifying the elements of a compensation package that "are usually associated with employment" as including social security taxes, retirement, health care, worker's compensation, and vacation benefits); *Rush*, 58 Fed. Appx at 322 (affirming the district court's finding that plaintiffs were independent contractors because they did "not accrue sick leave, vacation time or retirement benefits," citing *Adcock*, 166 F.3d at 1293); *Penland*, 1993 WL 204257 at *7.("Connecticut Mutual reported Mr. Penland's income on a 1099 form, which is used for nonemployee compensation, and did not withhold any state or federal income taxes from his general agent income. Nor did the company make contributions to the Federal Insurance Contributions Act, workers compensation or unemployment insurance on Mr. Penland's behalf").

Consequently, while the fact that inspectors were paid on an hourly basis is somewhat indicative of an employment relationship, the overall manner in which compensation arrangements for the position were structured – i.e., the fact that they were not paid regularly but only after submitting invoices; the fact that they received no benefits; and the fact that social security taxes were not paid – weighs in favor of a finding that the inspectors were independent contractors. See *Cilecek*, 115 F.3d at 262 ("While employees are often paid 'hourly wages,' independent

28

contractors are likewise often paid by the hour, e.g., plumbers. In this case, Cilecek's hourly rate enabled payment of fair compensation for fluctuating work and that fact is not indicative of whether Cilecek was an independent contractor or an employee").

## 7. Whether the Position Requires Special Skills

"Where no special skill is required of a worker, that fact supports a conclusion that the worker is an employee instead of an independent contractor." *Harris v. Vector Marketing Corp.*, 656 F.Supp.2d 1128, 1139 (N.D. Cal. 2009) (citing *Antelope Valley Press v. Poizner*, 162 Cal.App.4th 839, 855 (2008) (the fact that "[d]elivering papers requires no particular skill" indicated that carriers were employees); *Air Couriers Intern. v. Employment Develop't Dept.*, 150 Cal.App.4th 923, 934 (2007) (same)). See also *Crowd Management Services, Inc. v. United States*, 36 F.3d 1102, 1994 WL 481183, *3 (9th Cir. Sept. 6, 1994) (Unpub. Disp.) ("The Government contends that the workers were employees because they were not required to provide special skills to perform their jobs. Approximately 80 to 90% of peer security workers are college students who seek occasional employment. Crowd did not seek workers who had any particular skills or talents because the nature of the job did not require it. In this regard, the workers are similar to the employees in *General Inv. Corp.*[*v. United States*, 823 F.2d 337, 342 (9th Cir. 1987)] (miners did not require special skills), and *Avis* [*Rent A Car System, Inc. v. United States*, 503 F.2d 423, 430 (1974)] (car shuttlers brought no special skills to their job). This factor would support a finding that Crowd's workers were employees"); *Brohmer v. United States*, No. 1:02-CV-5649 OWW DLB, 2006 WL 3300398, *35 (E.D. Cal. Nov. 14, 2006) ("California courts have recognized that a worker is more likely to be an 'independent contractor' if his or her occupation requires a particularized skill and/or the exercise of judgment in its execution. . . . The court in *Borello* noted that the task performed by the employees in that case, sharecroppers, "involve[d] simple manual labor which can be performed in only one correct way . . . [and] can be learned quickly. While the work requires stamina and patience, it involves no peculiar skill beyond that expected of any employee,'" citing *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d at 341, 357 (1989)); *Theresa Enterprises, Inc. v. United States*, CV 74-389-AAH, 1976 WL 4186, *9 (C.D. Cal. May 26, 1976) ("If a special skill or knowledge

29

is required, the person rendering it may be an independent contractor. On the other hand, if the service required no particular skill or knowledge, the indication is that those rendering it are employees").

The solicitation identifies the following "mandatory requirements:" "(1) four year college degree; (2) ability to review materials of a sexually explicit nature in [their] entirety to determine compliance with law and regulations regarding the Sexual Exploitation and Abuse of Children ([s]pecifically, Title 18 United States Code Section 2257 regarding the record keeping requirements for producers of visual depictions of sexually explicit material, and 28 C.F.R. Part 75 concerning the inspection of records relating to [the] depiction of sexually explicit performances, as well as other applicable law[s] and regulations as necessary); (3) current secret level clearance (without escort) or ability to qualify for such clearance. . . ; (6) experience in the following areas: (a) internet-related investigations to include child pornography and crimes against children violations or (b) experience in conducting audits or inspections which determine compliance with federal statues, regulations, or policies or (c) demonstrated ability in preparing written reports, summarizing details of compliance reviews and investigations or (d) knowledge of criminal statutes and the ability to recognize and identify evidence of violations of local, state, and federal laws."[88]

The relatively advanced and specialized level of skills sought – including, for example, prior experience conducting audits and applying federal statutory and regulatory law – weighs in favor of a finding of independent contractor status. See *Weary v. Cochran*, 377 F.3d 522, 526-27 (6th Cir. 2004) ("The more specific factors articulated in *Darden* also favor characterizing Weary as an independent contractor. The first factor relates to the skill required to perform the job in question. In *Schwieger v. Farm Bureau Insurance Co.*, 207 F.3d 480, 485 (8th Cir. 2000), the court found that this factor 'weigh[ed] heavily in favor of independent contractor status' where the insurance agent 'considered herself an insurance professional: she was licensed by the state of Nebraska at her own expense, was subject to a code of professional ethics, and had been certified

_____

[88]Kearney Decl., Exh. 2 at 6.

by professional associations.' In this case, Weary admitted that the sale of insurance is a 'highly specialized field,' requiring considerable 'training,' 'education' and 'skill.' He also admitted that a state license was required in order to sell insurance and that he had taken licensure examinations in 'several' states"); *Brohmer*, 2006 WL 3300398 at *35 (finding that plaintiff was an independent contractor where "it appear[ed] to be essentially undisputed that Brohmer . . . exercise[d] a particularized skill as an aerial photographer, that he had considerable experience and training which enabled him to perform his 'art,' and that his work demanded the exercise of expert judgment to be performed correctly. For example, Reynolds testified that the aerial photography required in this case demands a high degree of skill and concentration in order to keep the MALD in camera sight"); *Bigalke v. Neenah Foundry Co.*, No. 05-C-29, 2006 WL 1663717, *4 (E.D. Wis. June 9, 2006) ("All the evidence shows is that Bigalke was retained as a software consultant with significant expertise in software training, which is, in fact, how she advertised herself to the company in the first place. Because it is clear that she brought significant specialized experience to the table, this factor tends to demonstrate her status as an independent contractor rather than an employee," citing *Salamon v. Our Lady of Victory Hosp.*, No. 99-CV-0048E(SR), 2006 WL 625839, *8 (W.D.N.Y. Mar. 10, 2006) ("As to the second factor, plaintiff is clearly a very skilled professional, which favors a finding of non-employee")). Conpare *Chao v. Westside Drywall, Inc.*, 709 F.Supp.2d 1037, 1065 (D. Or. 2010) ("There is no evidence that the laborers performed highly specialized work requiring a significant degree of skill, training, or education. . . . Defendants' only argument on this factor is that Guerrero testified that it takes four-to-five months of training to learn how to do dry wall. By itself, this is not compelling evidence of independent contractor status. Without more, this factor weighs in favor of employee status").

### 8.    Remaining Factors

The record contains insufficient evidence to evaluate the remaining factors that are relevant. There is no evidence, for example, regarding whether the inspectors used "instrumentalities and tools" provided by the FBI. *Darden*, 503 U.S. at 323. Based on the solicitation, it does not appear that the FBI would have had the ability "to assign additional projects" to the inspectors, *id.* although it does appear that, for these purposes, the FBI must be deemed to have been "in

business" and to have assigned a task that was "part of [its] regular business."  The remaining factor – the hired party's role in hiring and paying assistants – does not appear to be relevant.

### 9.  Conclusion Regarding Independent Contractor Versus Employee Status

As the Supreme Court noted, "the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . [and] all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Darden*, 503 U.S. at 324 (citing *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 258 (1968)).  Where the material facts are undisputed, "a court may decide the employee/independent contractor question as a matter of law if the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion." *Alberty-Velez*, 361 F.3d at 7 (citing *Dykes v. DePuy, Inc.*, 140 F.3d 31, 38-39 (1st Cir. 1998) (affirming the grant of summary judgment after concluding that an individual was an independent contractor), and *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 634 (1st Cir. 1996) (affirming the grant of judgment as a matter of law after concluding that an individual was an independent contractor)).  See *Adcock*, 166 F.3d at 1292-93 ("The parties agree that Chrysler's 'Sales and Service Agreement' and 'Additional Terms and Provisions' (collectively, the 'Agreement') would have governed their relationship had Chrysler awarded Adcock a dealership.  The Agreement is the only relevant evidence in the record regarding whether the relationship contemplated by the parties was an employment relationship. . . . Although a few terms of the Agreement weigh in favor of an employment relationship, all of the factors must be considered as a whole in determining employment/independent contractor status.  On balance, because the overwhelming majority of factors weigh in favor of independent contractor status, we conclude that the Agreement contemplated by Chrysler and Adcock would not have created an employment relationship").  See also *Barnhart*, 141 F.3d at 1313 ("There are factors that support the existence of an employment relationship between Barnhart and New York Life.  New York Life provided benefits such as life insurance, pension benefits, and a 401K program, which are usually associated with employment. . . . New York Life retained the right to terminate Barnhart's contract at-will.  The unilateral imposition of minimum standards by New York Life also infers an employer's control.  Additionally, New York Life employed Barnhart for

32

three years and during that time trained Barnhart how to be an agent. Considering all factors as a whole, however, the balance tips in favor of independent contractor status. The contract Barnhart signed contained clear language stating that Barnhart would be considered an independent contractor, not an employee. Consistent with this, Barnhart was free to operate his business as he saw fit without day-to-day intrusions. After the first three-year term of employment, Barnhart was paid commission only. Barnhart's tax returns indicate that he received most of his income from self-employment. . . . In light of these facts, we conclude that Barnhart was not an employee of New York Life for purposes of . . . the ADEA").

The evidence in this case is undisputed. Balancing all the relevant factors, the court concludes that plaintiff has failed to raise triable issues of fact as to whether he applied for employment with the FBI because the relevant factors point so clearly in the direction of an independent contractor relationship that a jury could not reach the opposite conclusion. Although the fact that the FBI required inspectors to work in a particular location weighs somewhat in favor of a finding of employee status, the "primary factor" that differentiates employees from independent contractors does not, because the FBI exercised minimal discretionary control over the means and manner in which the inspectors performed their work. *Adcock*, 166 F.3d at 1292. In addition, the undisputed evidence reveals that the parties intended an independent contractor relationship; that inspectors set their own hours so long as they did not require overtime access to the secure Van Nuys facility; that they were paid hourly but only after they submitted monthly invoices detailing their time; that the FBI did not pay social security taxes or provide retirement, health care, or vacation benefits for inspectors; and that a high level of skill was required to perform the inspections. All of these things are indicative of an independent contractor relationship. While no single factor is determinative, a strong majority of the relevant factors weighs in favor of a finding of independent contractor status.

Consequently, the court concludes, as a matter of law, that the 2257 inspector position for which plaintiff applied was an independent contractor position. See *Sibbald*, 294 F.Supp.2d at 1179 (finding that "the overwhelming evidence demonstrates that the Navy did not maintain the type of direct supervisory control over Plaintiff's terms and conditions of employment to render

the Navy Plaintiff's . . . employer" where plaintiff's job responsibilities and duties were defined in a contractual "Task Order," the Navy did not provide plaintiff a payroll package or benefits, and plaintiff's position was short term); *King v. Dalton*, 895 F.Supp 831, 841 (E.D. Va. 1995) (finding that "the totality of the circumstances, as reflected in the record evidence . . . points persuasively to the conclusion that the Navy was not King's employer" where the operative contract indicated that the Navy did not intent to treat plaintiff as an employee, "[t]he Navy simply did not maintain the sort of direct, supervisory control over the daily details of her work to render it her employer," and "King received no compensation, annual leave, or retirement benefits from the Navy, nor did the Navy pay her social security taxes"). [89]

---

[89]Because plaintiff has failed to raise triable issues of fact as to whether he applied for an employee position, the court need not consider defendant's alternate argument that plaintiff cannot state a claim under the ADEA because he applied for the inspector position in his corporate, rather than his individual, capacity. The court notes, however, that where an individual establishes a company through which he does business, this is one of several factors that must be weighed to determine whether plaintiff is an employee; there is no "*per se* rule that under the ADEA an individual who does business as a corporate entity can not be recognized as an employee of the company for whom he performs services." *Frankel v. Bally, Inc.*, 987 F.2d 86, 91 (2d Cir. 1993) ("Turning to Frankel's case, . . . the court held that because Frankel had established HFC as the corporate entity under which he did business, he had not established a 'direct' employer relationship with Bally. We agree with the district court that Frankel's establishment of HFC, and HFC's payment of salary and benefits to Frankel are important factors to be weighed in [the] analysis. . . . However, the corporate form under which a plaintiff does business is not dispositive in a determination of whether an individual is an employee or an independent contractor within the meaning of the ADEA. Indeed, no *per se* rule applies in such circumstances"). See also *Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440, 445 (2003) (holding that "the conventional master-servant relationship as understood by common-law agency doctrine" governs whether an individual is an "employee" under the ADA); *Darden*, 503 U.S. at 323-24 (listing the factors a court should consider in determining whether a hired party is an employee under the common law of agency, and stating that "[s]ince the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive,'" quoting *N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968)).

## III. CONCLUSION

For the reasons stated, the court grants defendant's motion for summary judgment.

DATED: July 30, 2012

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE